OVERTON, J.
 

 The object of this litigation is to annul the last will and testament of Alexander J. Heinemann.
 

 Heinemann never married. He left no heirs in the direct ascending line. His only legal heirs were collaterals. They comprised two brothers, a sister, and the children of a pre-¡deceased sister. He left an estate, consisting ■^almost entirely of corporate stocks, worth, jroughly stated, about $240,000, above liabilities.
 

 The efforts to annul the will are made by jthe children of the predeceased sister, who are entirely omitted from it. The will is in olographic form, is written on the letterhead of the New Orleans Baseball & Amusement Company, the place where it was written, namely, “New Orleans, La.,” is in print, but all of the rest of it is indisputably in the handwriting of the testator. It is written, including the punctuation and the spelling, as follows:
 

 “New Orleans, La. Jan 2-1930
 

 “This makes void any other will in existance What ever money lost by Larry Gilbert while operating in stock with me He shall be paid in full out of what is left of my estate, and the remaining divided amongst my heirs B N Heinemann A D Heinemann (Mrs J M Cohn Hannah Heinemann) Henry Angella shall be executive with out bond.
 

 “[Signed.] Alexander J Heinemann”
 

 The will was probated, and Henry Angelle, this being 'his correct name, was appointed testamentary executor, without bond. Thereafter, the present proceeding was brought by the children of the predeceased sister, Mrs. Mathilde Heinemann Weil, to annul the will on two grounds — the first of which is that the will does not bear a date, as is required by the law of this state to make valid an olographic will, and the second, though stated in three grounds, is that Heinemann, at the particular time of writing the will, did not possess the required qualifications to make a will, inasmuch as he was then suffering from such mental diseases, superinduced by, or resulting from, physical or other diseases or ailments of the body or mind, as to be incapable of making any valid will or donation, or, in short, that he was, at that particular time,
 
 *1062
 
 insane, and lacked the capacity to dispose of his estate.
 

 The contention that the will does not bear a date, as is required by law, does not rest upon the fact that “New Orleans, La.,” instead of being in the handwriting of the deceased, is in print, for counsel for the children of the predeceased sister correctly recognize that the place where the will is written is properly no part of the date of the will and may be disregarded, as not appearing, without affecting the validity of the will. Civ. Code, arts. 1588, 1589; Succession of Robertson, 49 La. Ann. 868, 21 So. 586, 62 Am. St. Rep. 672. The contention, as to the lack of date, rests upon the ground that a will, dated “Jan 2-1930,” though in the handwriting of the testator, is null, because Jan-nary, if that be the month intended, is written Jan, without even a period to denote the abbreviation, whereas the name of the month should be written in full.
 

 All that the law requires, so far as relates to the date of an olographic will, is that the date be certain, and, being a part of the will, that it be in the handwriting of the testator, or at least that so much of it be in his handwriting as to make the date certain, after disregarding such part of it as is not in his handwriting. Succession of Robertson, 49 La. Ann. 868, 21 So. 586, 62 Am. St. Rep. 672; Succession of McCay, 166 La. 681, 117 So. 772. Such also is the rule in France, under Article 970 of the French Civil Code, which is substantially similar to article 1588 of the Civil Code of Louisiana, requiring that the olographic will be entirely written, dated, and signed by the hand of the testator, and providing that it is not subject to any other form. Fuzier-Herman, Code Civil Annote, Vol. 2, under article 970 of Code, p. 655, No. 94; Baudry-Lacantinerie, Droit Civil, Vol. 2, p. 385, No. 548; Demolombe, Code Napoleon, Vol. 21, p. 76, No. 81; Aubrey et Rau, Droit. Civil Francais, Vol. 7, p. 103, No. 2; Laurent, Droit Civil Francais, Vol. 13, pp. 200-210, Nos. 188-196. These authorities, or most of. them, will show that the usual form of writing the month and day may be substituted by any equivalent enunciation, fixing, in a definite manner, the date of the testament, for instance, by the enunciation of an historical anniversary, such as an anniversary of the battle of Waterloo, or of a religious or national festival, such as Easter Day, 1860.
 

 Neither this court nor, so far as appears, have the courts of France passed directly upon the identical question, here presented; but the principle, relative to the requirement that the date, without reference so much to the particular form in which it is written, be expressed with certainty, and not be left uncertain, is applicable here. The Century Dictionary, under the word “January,” says that it is abbreviated “Jan.” It is quite common to abbreviate that month, and to do so in the manner stated, that is, as “Jan.” That abbreviation can refer to no other month in the calendar year than January. It would be otherwise had the abbreviation been “J’y-,” for then it would refer equally as well to July as to January. Our conclusion, therefore, is that the date, “Jan 2-1930,” means January 2, 1930, and cannot mean anything else, and hence, that the abbreviated form adopted by the testator complies fully with the law. The absence of the period to denote the abbreviation is of no importance. The abbreviation is sufficiently manifest without it.
 

 Upon the second ground of attack, relating to the mental capacity of the testator to dispose of his estate validly at the time he wrote his will, a voluminous record has been built.
 

 The testator began his career in life without any financial means. One of his first ven
 
 *1064
 
 tures was the handling of the concession privileges, consisting of the sale of soft drinks, peanuts, and the like at a baseball park in New Orleans. He rose, through his energy, thrift, and judgment, step by step, when, in 1914, he was elected to the presidency and treasurership of the New Orleans Baseball Club, and was- repeatedly re-elected thereto, until bis death on January 8, 1930. After his rise to prominence in baseball circles, he began speculating in stocks, buying the stocks outright, and not upon margin. He was quite successful in these ventures, and, in October, 1929,' owned over $550,000 of various stocks, and owed the bank over $200,000 for money borrowed with which to purchase stocks, the loan being secured by shares valued at approximately $450,000.
 

 Towards the latter part of the testator’s ventures in the stock market he encouraged Larry Gilbert, named by him as one of his legatees, to enter the stock market and purchase stock, under his general guidance. He evidently hoped to assist in raising Gilbert from an humble position, such a one as he had held in his younger days, to a position of financial ease.
 

 In October, 1929, there was a heavy deline in the stock market. The testator’, as did all similarly situated, lost rather heavily. However, to all outward appearances, he treated the loss lightly, and expressed the. view that stocks would soon regain their former position in the market. In November, 1929, there was a second heavy decline in the stock market. As a result of this decline and of the first decline the testator’s 'stock shrunk approximately sixty per centum in value. However, his bank did not call upon him for additional security, but the testator’s loss was such as to cause him to worry, after the second decline, a great deal. Sleepless, or almost sleepless nights, followed. At times, it is said, the testator was heard to call upon God, in the dead hours of the night, to take him away. At other times, it is said, he was heard to call, in the late hours of the night, the name of his boarding house proprietor, as if he desired something, only to reply, when the proprietor responded, that he had not called for him. It is said also that at times, towards the end, he would leave his room at about three o’clock in the morning and go to his office at the baseball park. This he explained, when questioned by his boarding house proprietor concerning his action, by saying that he did so because he could not sleep.
 

 During this period he attended to the duties of his office, as president of the baseball club, in his usual manner, and was re-elected to that office a few days before his death. During that period he thought of disposing of a large part of his stocks, but was persuaded not to do so by his broker and a bank official.
 

 On January 2, 1930, he wrote his will, which is the will in contest here. While writing it he asked an employee in his office how to spell one or two words. One of these was the word, “executor,” which apparently, though not unmistakably, he wrote as “executive” — a mistake, ■ if he so wrote it, of no serious consequence whatever. A day or two later, his- conduct and actions, at times, were such as might indicate that he was contemplating suicide, although they did not so impress those in his office at the moment. On January 8, 1930, six days after he wrote his will, he shot himself, under circumstances indicating suicide.
 

 The foregoing is a brief outline of the situation surrounding the testator and of what occurred from the first decline in the stock market to the testator’s death.
 

 
 *1066
 
 To show the testator’s incapacity to dispose of his estate by last will and testament those attacking the will rely chiefly upon evidence showing that the testator received a severe shock at the time of the second heavy decline in the stock market; upon evidence tending to show that there was a strain of hereditary mental weakness in the family which was instrumental, in connection with the shock he had received, in incapacitating the testator to dispose of his estate; and on evidence showing that the testator committed suicide. It is urged that this evidence shows that the will of the testator should be annulled by reason of his lack of testamentary capacity, or, in other words, by reason of his insanity.
 

 “Testamentary capacity has been defined to be the ability to comprehend the conditions of one’s property, and his relations to those who may naturally expect to become the objects of his bounty.” Succession of Brugier, 116 La. 29, S3 So. 366, 369; Godden v. Executors of Burke, 35 La. Ann. 160; Succession of Ford, 151 La. 571, 92 So. 61. The capacity to make a will is tested as of the date the will is made. Succession of Brugier; Succession of Ford, supra.
 

 The record in this case fails to show that the testator, on the day he made his will, was unable to comprehend the condition of his estate and the relations he bore to those who might naturally expect to become the objects of his bounty. In our view, he was sane on that day, though greatly troubled in mind, and wqs sane before then, and even on the day of his death.
 

 The record leaves no doubt that he was greatly shocked by his losses in. the stock market. His sleepless nights, the calling out to his landlord, and the invoking of God in the dead hours of the night to take him away disclose the troubled condition of his mind, and his anxiety concerning the future of the market, in which he was vitally interested, but these facts do not disclose insanity, nor is it urged that they do so of themselves. The evidence offered to show a diseased mental strain in the family of the testator fails to show that the strain was in his ancestry, and therefore might be expected to affect him. The evidence offered to show that the testator committed suicide, and that he contemplated committing it several days before he did so, establishes those facts. However, it does not necessarily follow that the testator was insane, or was unable to comprehend the condition of his estate and his obligation to those who might expect to be the objects of his bounty.
 

 If reference be made to the will itself, no indications of insanity appear. The will is not difficult to understand. Its bequests are perfectly natural and, from a human standpoint, are perfectly sensible. He- left his estate to those he loved or cared something for, or to. whom he felt under obligations, and to the rest, whether related or not, he left nothing. He was not called upon, by law, to provide for any particular person, for he left no forced heirs. He omitted his nephews and nieces — the opponents.of his will — from mention therein, evidently because he had formed a dislike for them, occasioned by a supposed slight at their mother’s funeral.
 

 The weight of the evidence, as appears from the testimony of those thrown with the testator, during this period, is that he was sane. The weight of the expert evidence is to the same effect. Our conclusion is that the testator, although he took deeply to heart his losses in the stock market, and even feared the possibility of ruin should there be a third heavy decline in the market, yet, nevertheless, was sane and capable of understand
 
 *1068
 
 ing the condition-of his estate when he
 
 wrote
 
 his will, and that he committed suicide, because he did not care to live in the face of his heavy losses, with no hope of quick recuperation, and the possibility of ruin ahead.
 

 . The trial judge held that the testator was sane, and that the will was valid. We think that he is correct.
 

 The judgment is affirmed.