589 A.2d 1339

IN THE MATTER OF THE PROBATE OF THE ALLEGED WILL
OF RUSSELL G. RANNEY, DECEASED.

Argued January 28, 1991—Decided April 30, 1991.

2

*Thomas J. Goodwin* argued the cause for appellant, Betty McGregor (*Krugman, Chapnick & Grimshaw,* attorneys; *Thomas J. Goodwin, Ward C. Laracy,* and *John P. Belardo,* on the briefs).

*Richard F. Lert* argued the cause for respondent Ranney School (*Wilentz, Goldman & Spitzer,* attorneys).

*David L. Menzel* argued the cause for respondents Suzanne R. Bass, Henry Bass, and Harland Ranney (*Stryker, Tams & Dill,* attorneys; *David L. Menzel* and *Lawrence A. Goldman,* of counsel; *Caroline Record,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The sole issue is whether an instrument purporting to be a last will and testament that includes the signature of two witnesses on an attached self-proving affidavit, but not on the will itself, should be admitted to probate. At issue is the will of Russell G. Ranney. The Monmouth County Surrogate ordered probate of the will, but the Superior Court, Law Division, Probate Part, reversed, ruling that the will did not contain the signatures of two witnesses as required by *N.J.S.A.* 3B:3–2. The Appellate Division found that the self-proving affidavit formed part of the will and, therefore, that the witnesses had signed the will as required by the statute. 240 *N.J.Super.* 337, 573 *A.*2d 467 (1990). It reversed the judgment of the Law Division and remanded the matter for a plenary hearing on the issue of execution. We granted the contestant's petition for certification, 122 *N.J.* 163, 584 *A.*2d 230 (1990), and now affirm the judgment of the Appellate Division.

–I–

The following facts emerge from the uncontested affidavits submitted in support of probate of the will. On October 26, 1982, Russell and his wife, Betty (now known as Betty McGregor), visited the law offices of Kantor, Mandia, and Schuster to execute their wills. Russell's will consisted of four pages and a fifth page containing a self-proving affidavit, entitled "ACKNOWLEDGMENT AND AFFIDAVIT RELATING TO EXECUTION OF WILL." The pages of Russell's will were neither numbered nor attached before execution. After Russell and Betty had reviewed their wills, they and their attorney, Robert Kantor, proceeded to a conference room, where they were joined by Kantor's partner John Schuster III and by two secretaries, Laura Stout and Carmella Mattox, who was also a notary.

Consistent with his usual practice, Kantor asked Russell if the instrument represented Russell's will and if Russell wanted

Schuster and Stout to act as witnesses. Russell answered both questions affirmatively, and signed the will on the fourth page:

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 26th day of October, One Thousand Nine Hundred and Eighty Two.

/s/ Russell G. Ranney
Russell G. Ranney

No one else signed the fourth page of the will. Russell, followed by Schuster and Stout, then signed the self-proving affidavit on the fifth page. Both Schuster and Stout believed that they were signing and attesting the will when they signed the affidavit. Furthermore, both Kantor, who had supervised the similar execution of many wills, and Schuster believed that the witnesses' signatures on the "Acknowledgment and Affidavit" complied with the attestation requirements of *N.J.S.A.* 3B:3–2. Mattox, whose practice was to notarize a document only if she witnessed the signature, notarized all the signatures.

After execution of the will, Stout stapled its four pages to the self-proving affidavit. The fifth and critical page reads:

## ACKNOWLEDGMENT AND AFFIDAVIT RELATING TO EXECUTION OF WILL

STATE OF NEW JERSEY

ss.

COUNTY OF MONMOUTH

RUSSELL G. RANNEY, JOHN SCHUSTER III, and LAURA J. STOUT, the Testator and the witnesses, respectively whose names are signed to the attached instrument, being first duly sworn, do hereby declare to the undersigned authority that the Testator signed and executed the instrument as his Last Will and Testament and that he signed willingly and that he executed it as his free and voluntary act for the purposes therein expressed; and that each witness states that he or she signed the Will as witnesses in the presence and hearing of the Testator and that to the best of his or her knowledge, the Testator was at the time 18 or more years of age, of sound mind and under no constraint or undue influence.

/s/ Russell G. Ranney
RUSSELL G. RANNEY
/s/ John Schuster III
/s/ Laura J. Stout

Subscribed, sworn to, and acknowledged before me, by Russell G. Ranney, the Testator, and subscribed and sworn to before me by JOHN SCHUSTER III and LAURA J. STOUT, witnesses, this 26 day of October 1982.

/s/ Carmella Mattox
Notary

The acknowledgment and affidavit is almost identical to the language suggested by *N.J.S.A.* 3B:3–5 for a self-proving affidavit signed subsequent to the time of execution. The form for making a will self-proved at the time of execution, as occurred here, is set forth in the preceding section, *N.J.S.A.* 3B:3–4. Although the subject affidavit was executed simultaneously with the execution of the will, the affidavit refers to the execution of the will in the past tense and incorrectly states that the witnesses had already signed the will.

Immediately after the execution of Russell's will, Betty executed her will in the presence of the same witnesses. As with Russell's will, Schuster and Stout signed the page containing the self-proving affidavit, but did not sign the will. Betty's will contained somewhat different dispositive provisions, and each page bore a legend identifying it as one page of "a three page will." The acknowledgment and affidavit, which appeared on the fourth page of the document, bore the legend "attached to a three page will."

Russell's will gives Betty a life estate in their apartment in a building at 111 Avenue of Two Rivers in Rumson, the rental income from other apartments in that building, and the tuition and rental income from the Rumson Reading Institute, which was merged into the Ranney School after the execution of Russell's will. The will further directs that on Betty's death, the Avenue of Two Rivers property and the proceeds of the Institute are to be turned over to the trustees of the Ranney School. Additionally, Betty receives all of Russell's personal property except that necessary for the operation of the Institute.

The residue of Russell's estate is to be paid in trust to Betty, Kantor, and Henry Bass, Russell's son-in-law, who were also

appointed as executors. Betty and Harland Ranney and Suzanne Bass, Russell's two children, are to receive thirty-two percent each of the trust income, and are to share equally the net income from the operation of Ransco Corporation. Nancy Orlow, Betty's daughter and Russell's step-daughter, is to receive the remaining four percent of the trust income. Russell's will provides further that after Betty's death the income from Ransco Corporation is to be distributed equally between Harland Ranney and Suzanne Bass, and on their deaths is to be distributed to the Ranney School.

Russell died on April 4, 1987, and the Monmouth County Surrogate admitted the will to probate on April 21, 1987. Kantor represented Betty during the probate proceedings, but on March 8, 1988, he was disbarred for reasons unrelated to this case. See *In re Kantor*, 109 *N.J.* 647 (1988). Subsequently, Betty retained new counsel and contested the probate of Russell's will. She did not, however, assert that the will was the product of fraud or undue influence. Nor did she contend that it failed to express Russell's intent. Her sole challenge was that the will failed to comply literally with the formalities of *N.J.S.A.* 3B:3–2. Suzanne R. Bass, Harland Ranney, Henry Bass, and the Ranney School urged that the will be admitted to probate.

Without taking any testimony, the Law Division heard the matter on the return date of Betty's order to show cause. The court was satisfied that the will was Russell's last will and testament, but felt constrained to deny probate because the attesting witnesses had not strictly complied with the requirements of *N.J.S.A.* 3B:3–2.

Although the Appellate Division "decline[d] to hold that the placement of the witnesses' signatures is immaterial," 240 *N.J.Super.* at 344, 573 *A.*2d 467, it ruled that the self-proving affidavit was part of the will and that the witnesses' signatures on the affidavit constituted signatures on the will, *id.* at 344–45, 573 *A.*2d 467. Treating Russell's will as if it contained a

defective attestation clause, the court remanded for a hearing to determine whether Russell had executed the document as his will, whether Schuster and Stout had signed the self-proving affidavit in response to Russell's request to witness the will, and whether they had witnessed either Russell's signature or his acknowledgment of that signature. *Id.* at 345, 573 *A.*2d 467.

We disagree with the Appellate Division that signatures on the subsequently-executed self-proving affidavit literally satisfied the requirements of *N.J.S.A.* 3B:3-2 as signatures on a will. We further hold, however, that the will may be admitted to probate if it substantially complies with these requirements.

–II–

■ The first question is whether Russell's will literally complies with the requirements of *N.J.S.A.* 3B:3-2, which provides:

[E]very will shall be in writing, signed by the testator or in his name by some other person in his presence and at his direction, and shall be signed by at least two persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will.

In holding that signatures on the self-proving affidavit satisfy *N.J.S.A.* 3B:3-2, the Appellate Division relied on out-of-state decisions that permitted the probate of wills when the witnesses signed a self-proving affidavit, but not the will. 240 *N.J.Super.* at 344, 573 *A.*2d 467. The rationale of those cases is that a self-proving affidavit and an attestation clause are sufficiently similar to justify the conclusion that signatures on a self-proving affidavit, like signatures on the attestation clause, satisfy the requirement that the signatures be on the will. See *In re Estate of Charry,* 359 *So.*2d 544, 545 (Fla.Dist.Ct.App.1978) (witnesses' signatures on self-proving affidavit on same page as testator's signature satisfied attestation requirements); *In re Estate of Petty,* 227 *Kan.* 697, 702-03, 608 *P.*2d 987, 992-93 (1980) (self-proving affidavit on same page as testator's signature substantially complies with attestation requirements); *In*

*re Cutsinger,* 445 *P.*2d 778, 782 (Okla.1968) (self-proving affidavit executed on same page as testator's signature is an attestation clause in substantial compliance with statutory requirement); *see also In re Will of Leitstein,* 46 *Misc.*2d 656, 657, 260 *N.Y.S.*2d 406, 407–08 (Sur.1965) (probating will when witnesses signed affidavit purporting to be attestation clause). The Appellate Division found that the similarity between self-proving affidavits and attestation clauses warrants treating the affidavit attached to Russell's will as the equivalent of an attestation clause. 240 *N.J.Super.* at 345, 573 *A.*2d 467. Noting that the absence of an attestation clause does not void a will, but merely requires the proponents to prove due execution, the Appellate Division could find "no reason, either in logic or policy, to deny a similar opportunity to the proponents" of Russell's will. *Ibid.* That conclusion fails to consider, however, the fundamental differences between a subsequently-executed, self-proving affidavit and an attestation clause. We are unable to conclude that a will containing the signatures of witnesses only on such an affidavit literally complies with the attestation requirements of *N.J.S.A.* 3B:3–2.

Self-proving affidavits and attestation clauses, although substantially similar in content, serve different functions. Mann, *Self-Proving Affidavits and Formalism in Wills Adjudication,* 63 *Wash.U.L.Q.* 39, 41 (1985). Attestation clauses facilitate probate by providing "prima facie evidence" that the testator voluntarily signed the will in the presence of the witnesses. 5 A. Clapp, *N.J. Practice: Wills and Administration* § 133 at 335 (3d ed.1982). An attestation clause also permits probate of a will when a witness forgets the circumstances of the will's execution or dies before the testator. *Id.* at 337.

Self-proving affidavits, by comparison, are sworn statements by eyewitnesses that the will has been duly executed. Mann, *supra,* 63 *Wash.U.L.Q.* at 40. The affidavit performs virtually all the functions of an attestation clause, and has the further effect of permitting probate without requiring the appearance

of either witness. *Id.* at 41; 8 A. Clapp, *supra*, § 2063 at 9, comment 1. Wills may be made self-proving simultaneously with or after execution. *N.J.S.A.* 3B:3–4, –5. One difference between an attestation clause and a subsequently-signed, self-proving affidavit is that in an attestation clause, the attestant expresses the present intent to act as a witness, but in the affidavit, the affiant swears that the will has already been witnessed. This difference is more apparent than real when, as here, the affiants, with the intent to act as witnesses, sign the self-proving affidavit immediately after witnessing the testator's execution of the will.

The Legislature first authorized self-proving affidavits in the 1977 amendments to the Probate Code, specifically *N.J.S.A.* 3A:2A–6. Nothing in the statutory language or history intimates that the Legislature contemplated a subsequently-executed affidavit as a substitute for the attestation clause. Instead, the 1977 amendments indicate that the Legislature envisioned the will, including the attestation clause, as independent from such an affidavit. Hence, the form provided in *N.J.S.A.* 3B:3–5 for a subsequently-signed affidavit refers to the will as a separate instrument and states that the testator and witnesses have signed the will. Thus, the Legislature indicated its intention that subsequently-executed, self-proving affidavits be used solely in conjunction with duly-executed wills. Although the execution of Russell's will and of the self-proving affidavit apparently were contemporaneous, the affidavit follows the form provided in *N.J.S.A.* 3B:3–5. Consequently, the signatures of the witnesses on the subject self-proving affidavit do not literally comply with the statutory requirements.

■ That finding does not end the analysis. As we stated in *In re Estate of Peters*, 107 *N.J.* 263, 526 *A.*2d 1005 (1987), in limited circumstances a will may be probated if it substantially complies with those requirements. *Id.* at 281 n. 4, 526 *A.*2d 1005.

Other states have recognized that a will failing to satisfy the attestation requirements should not be denied probate when the witnesses have substantially complied with those requirements and the testator clearly intended to make a will. See, *e.g.*, *In re LaMont's Estate*, 39 *Cal.*2d 566, 569–70, 248 *P.*2d 1, 2–3 (1952) (signature of witness substantially complied with execution requirements even if witness thought he was signing as executor); *In re Estate of Petty, supra*, 227 *Kan.* at 702–03, 608 *P.*2d at 992–93 (witnesses' signatures on self-proving affidavit substantially comply with attestation requirements); *Smith v. Neikirk*, 548 *S.W.*2d 156, 158 (Ky.Ct.App.1977) (will substantially satisfies statutory requirements even though witness turned back on testator at moment of signing and another witness signed as notary); *In re Will of Kiefer*, 78 *Misc.*2d 262, 264, 356 *N.Y.S.*2d 520, 522–23 (Sur.1974) (will admitted to probate when only one of two witnesses signed); *see also* 2 Bowe & Parker, *Page on Wills* § 19.4 nn. 15–21 (1960) (collecting cases applying rule of substantial compliance).

Scholars also have supported the doctrine of substantial compliance. Langbein, *Substantial Compliance with the Wills Act*, 88 *Harv.L.Rev.* 489 (1975); Nelson & Starck, *Formalities and Formalism: A Critical Look at the Execution of Wills*, 6 *Pepperdine L.Rev.* 331, 356 (1979). At the 1990 annual conference, the Commissioners on Uniform State Laws added a section to the Uniform Probate Code explicitly advocating the adoption of the doctrine. *Uniform Probate Code* § 2–503 (National Conference of Commissioners on Uniform State Laws 1990). That section, 2–503, provides:

Although a document * * * was not executed in compliance with § 2–502 [enumerating the wills formalities], the document * * * is treated as if it had been executed in compliance with that section if the proponent of the document * * * establishes by clear and convincing evidence that the decedent intended the document to constitute (i) the decedent's will * * *.

In the 1990 edition of the *Restatement (Second) of Property* (Donative Transfers) (*Restatement*), moreover, the American Law Institute encourages courts to permit probate of wills that substantially comply with will formalities. § 33.1 comment g

(Tentative Draft No. 13) (approved by the American Law Institute at 1990 annual meeting). The *Restatement* concludes that in the absence of legislative action, courts "should apply a rule of excused noncompliance, under which a will is found validly executed if the proponent establishes by clear and convincing evidence that the decedent intended the document to constitute his or her will." *Ibid.* Thus, courts and scholars have determined that substantial compliance better serves the goals of statutory formalities by permitting probate of formally-defective wills that nevertheless represent the intent of the testator.

–III–

Substantial compliance is a functional rule designed to cure the inequity caused by the "harsh and relentless formalism" of the law of wills. Langbein, *supra,* 88 *Harv.L.Rev.* at 489; *see also* L. Waggoner, R. Wellman, G. Alexander & M. Fellows, *Family Property Law: Wills, Trusts and Future Interests* 32–35 (Tentative Draft 1990) (discussing genesis of substantial compliance doctrine). The underlying rationale is that the

> finding of a formal defect should lead not to automatic invalidity, but to a further inquiry: does the noncomplying document express the decedent's testamentary intent, and does its form sufficiently approximate Wills Act formality to enable the court to conclude that it serves the purposes of the Wills Act?
> [Langbein, *supra,* 88 *Harv.L.Rev.* at 489.]

Scholars have identified various reasons for formalities in the execution of wills. The primary purpose of those formalities is to ensure that the document reflects the uncoerced intent of the testator. *Id.* at 492; Mann, *supra,* 63 *Wash.U.L.Q.* at 49. Requirements that the will be in writing and signed by the testator also serve an evidentiary function by providing courts with reliable evidence of the terms of the will and of the testamentary intent. Gulliver & Tilson, *Classification of Gratuitous Transfers,* 51 *Yale L.J.* 1, 6–7 (1941). Additionally, attestation requirements prevent fraud and undue influence. *Id.* at 9–10; *In re Estate of Peters, supra,* 107 *N.J.* at 276, 526 *A.*2d 1005. Further, the formalities perform a "channeling function" by requiring a certain degree of uniformity in the

organization, language, and content of wills. Langbein, *supra*, 88 *Harv.L.Rev.* at 494. Finally, the ceremony serves as a ritual that impresses the testator with the seriousness of the occasion. Gulliver & Tilson, *supra*, 51 *Yale L.J.* at 5.

Rigid insistence on literal compliance often frustrates these purposes. *Restatement, supra,* § 33.1 comment g (strict compliance has in many cases led courts to results that defeated the intent of the testator). To avoid such frustration, some courts, although purporting to require literal compliance, have allowed probate of technically-defective wills. See *In re Estate of Bochner,* 119 *Misc.*2d 937, 938, 464 *N.Y.S.*2d 958, 959 (Sur. 1983); *In re Will of Leitstein, supra,* 46 *Misc.*2d at 657, 260 *N.Y.S.*2d at 408. Other courts have refused to probate wills because of technical defects despite evidence that the testator meant the document to be a will. See *In re Estate of Sample,* 175 *Mont.* 93, 96–97, 572 *P.*2d 1232, 1234 (1977) (refusing to probate will signed only on attached self-proving affidavit); *Boren v. Boren,* 402 *S.W.*2d 728, 729 (Tex.1966). Leading authorities have criticized the *Boren* rule, finding no basis in logic or policy for its blind insistence on voiding wills for "the most minute defect[s] in formal compliance * * * no matter how abundant the evidence that the defect [is] inconsequential." Langbein, *supra,* 88 *Harv.L.Rev.* at 489; *accord In re Estate of Charry, supra,* 359 *So.*2d at 545 (declining to follow *Boren* rule because it elevated form over substance); Mann, *supra,* 63 *Wash.U.L.Q.* at 39–40 (characterizing *Boren* line of cases as "odd and rather perverse"); Nelson & Starck, *supra,* 6 *Pepperdine L.Rev.* at 356–57.

We agree with those authorities. Compliance with statutory formalities is important not because of the inherent value that those formalities possess, but because of the purposes they serve. Mann, *supra,* 63 *Wash.U.L.Q.* at 60; Nelson & Starck, *supra,* 6 *Pepperdine L.Rev.* at 355. It would be ironic to insist on literal compliance with statutory formalities when that insistence would invalidate a will that is the deliberate and voluntary act of the testator. Such a result would frustrate rather

than further the purpose of the formalities. Nelson & Starck, *supra,* 6 *Pepperdine L.Rev.* at 353–55.

Concerned about inequities resulting from excessive adherence to formalism, the Commissioners on Uniform State Laws proposed the Uniform Probate Code. The goals of the Code were to simplify the execution of wills, *Uniform Probate Code,* art. 2, pt. 5, General Comment at 46 (1974), and to recognize the intent of the testator in the distribution of his property, *id.* at § 1–102(b)(2). Consequently, the Commissioners minimized the formalities of execution and diminished "the ceremonial value of attestation." Langbein, *supra,* 88 *Harv.L.Rev.* at 510–11. Responding to similar concerns in 1977, the New Jersey Legislature adopted a variation of the Uniform Probate Code that differed significantly from its pre-Code predecessor. 1977 *N.J. Laws,* ch. 412, § 1; *see In re Estate of Peters, supra,* 107 *N.J.* at 271, 526 *A.*2d 1005. Thus, *N.J.S.A.* 3B:3–2, like its identical 1977 counterpart, *N.J.S.A.* 3A:2A–4, does not require that witnesses sign in the presence of the testator and of each other. *In re Estate of Peters, supra,* 107 *N.J.* at 273, 526 *A.*2d 1005. The 1977 amendments also removed the interested-witness provisions, *N.J.S.A.* 3A:2A–7, with the result that a beneficiary who acts as a witness is no longer prevented from taking under a will, *N.J.S.A.* 3B:3–8. As a result of those amendments, moreover, unwitnessed holographic wills could be admitted to probate. *N.J.S.A.* 3A:2A–5. Under the current provision, *N.J. S.A.* 3B:3–3, a holographic will is valid whether or not witnessed, so long as the signature and material provisions of the will are in the handwriting of the testator. *N.J.S.A.* 3B:3–3. The approval of unwitnessed holographic wills, like the diminution of attestation requirements, reflects a more relaxed attitude toward the execution of wills.

Legislative history confirms that *N.J.S.A.* 3B:3–2 was enacted to free will execution from the ritualism of pre-Code law and to prevent technical defects from invalidating otherwise valid wills. Senate Judiciary Committee Public Hearing on Uniform Probate Code Bills at 20 (comments of Harrison Durand) (reduc-

tion of statutory formalities meant to prevent failure of testamentary plans); *see In re Estate of Peters, supra,* 107 *N.J.* at 272 n. 2, 526 *A.*2d 1005 (noting that former statute often resulted in wills being refused probate because some formality not followed). Generally, when strict construction would frustrate the purposes of the statute, the spirit of the law should control over its letter. *New Jersey Builders, Owners & Managers Ass'n v. Blair,* 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972). Accordingly, we believe that the Legislature did not intend that a will should be denied probate because the witnesses signed in the wrong place.

The execution of a last will and testament, however, remains a solemn event. A careful practitioner will still observe the formalities surrounding the execution of wills. When formal defects occur, proponents should prove by clear and convincing evidence that the will substantially complies with statutory requirements. *See Uniform Probate Code, supra,* § 2–503; *Restatement, supra,* § 33.1 comment g. Our adoption of the doctrine of substantial compliance should not be construed as an invitation either to carelessness or chicanery. The purpose of the doctrine is to remove procedural peccadillos as a bar to probate.

Furthermore, as previously described, *ante* at 8–10, a subsequently-signed self-proving affidavit serves a unique function in the probate of wills. We are reluctant to permit the signatures on such an affidavit both to validate the execution of the will and to render the will self-proving. Accordingly, if the witnesses, with the intent to attest, sign a self-proving affidavit, but do not sign the will or an attestation clause, clear and convincing evidence of their intent should be adduced to establish substantial compliance with the statute. For that reason, probate in these circumstances should proceed in solemn form. See *N.J. S.A.* 3B:3–23; *R.* 4:84–1. Probate in solemn form, which is an added precaution to assure proof of valid execution, may be initiated on an order to show cause, *R.* 4:84–1(b), and need not unduly delay probate of a qualified will.

-IV-

█ The record suggests that the proffered instrument is the will of Russell Ranney, that he signed it voluntarily, that Schuster and Stout signed the self-proving affidavit at Russell's request, and that they witnessed his signature. Furthermore, Betty has certified that Russell executed the will and that she is unaware of the existence of any other will. Before us, however, her attorney questions whether Russell "actually signed" the will. If, after conducting a hearing in solemn form, the trial court is satisfied that the execution of the will substantially complies with the statutory requirements, it may reinstate the judgment of the Surrogate admitting the will to probate.

. Following the judgment of the Appellate Division, this Court amended the Rules of Civil Procedure pertaining to probate practice. Those amendments resulted in the allocation of the probate jurisdiction of the Law Division to the Chancery Division, Probate Part. *See R.* 4:83.

The judgment of the Appellate Division is affirmed, and the matter is remanded to the Chancery Division, Probate Part.

*For affirmance and remandment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—6.

*Opposed*—None.