848 A.2d 81 (2003)
369 N.J. Super. 136
In the Matter of the Probate of the Alleged WILL OF Ronald D. FERREE, Deceased.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided March 11, 2003.
*82 Lawrence A. Carton, III, Middletown, for plaintiff Charles Creel (Carton & Associates, attorneys).
Patricia A. Bennett, for defendant Michael Ferree.
FISHER, P.J.Ch.
This case raises an issue of first impression in this State: may the filling in of blanks in a pre-printed form result in the creation of a valid holographic will? Because accepted legal principles compel the ignoring of all pre-printed language in an alleged holograph, because vast portions of the material provisions are not handwritten, and because the document is unintelligible without resort to the pre-printed words, the proffered document may not be admitted to probate.

I
The factsall of which are undisputed may be simply and briefly stated. Ronald Ferree ("decedent") died, apparently by his own hand, on July 13, 2002. Near his body was a document purporting to be his Last Will and Testament. The parties acknowledge that decedent executed this document, the handwritten portions were written by decedent, and decedent's signature was witnessed by only one person. The parties also agree that there is no later or prior will[1] and, if the document in question is not admitted to probate, decedent's *83 estate will pass pursuant to the laws of intestacy.
Plaintiff Charles Creel ("plaintiff") is a named beneficiary in the document in question, but not an heir at law. Accordingly, plaintiff will not be entitled to share in decedent's estate if the document is not admitted to probate.

II
In the United States, the right to make a will is not viewed as a "natural right" and no constitutional protection attaches. Girard Trust Co. v. Schmitz, 129 N.J.Eq. 444, 453, 20 A.2d 21 (Ch.Ct.1941); Renwick v. Martin, 126 N.J. Eq. 564, 568, 10 A.2d 293, 297 (Prerog.Ct.1939); 1 Page on Wills (Bowe-Parker revision, 1960) § 3.1. As a result, the right to transfer property upon death, and the manner for effectively making such a transfer, is subject to legislative control, as our Supreme Court has recognized:
The right of a citizen to dispose of his property by will has always been deemed a legislative creation. The state may regulate the manner and terms upon which his property, both real and personal, within its jurisdiction may be transmitted by will or by inheritance. It may prescribe who shall take, and who shall not be capable of taking, the property. And the privilege of transmission of property by will or by intestacy may be made subject to such terms as in the judgment of the state will serve the public good.
[United States v. Kingsley, 41 N.J. 75, 79, 194 A.2d 735, 737 (1963).]
Accordingly, in determining what should be admitted to probate, the court is bound to consider the Legislature's carefully-crafted parameters.
In regulating the manner in which citizens may dispose of property upon death, the Legislature has concluded that "every will shall be in writing, signed by the testator or in his name by some other person in his presence and at his direction, and shall be signed by at least two persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will." N.J.S.A. 3B:3-2. The parties agree that the document offered for probate fails to comply with the formalities required by N.J.S.A. 3B:3-2 because only one person executed the document as a witness.
The Legislature has recognized and provided for one exception to the requirements of N.J.S.A. 3B:3-2. That is, a holographic will may be admitted to probate. N.J.S.A. 3B:3-3. Accordingly, it must be determined whether this document is a valid holographic will; if not, then the complaint should be dismissed and decedent's property distributed by way of the laws of intestacy.

III
The Statute of Wills exists, in the words of the late Judge Clapp, one of this State's leading authorities in the field, "to forestall frauds by the living upon the dead." In re Taylor's Estate, 28 N.J.Super. 220, 226, 100 A.2d 346, 349 (App.Div. 1953). The terms of the statute permitting holographic wills endeavor to be consistent with that approach. While the apparent purpose in allowing holographic wills was to provide lay persons with the ability to make their own wills without the expense of legal assistance, see Matter of Estate of Krueger, 529 N.W.2d 151, 154 (N.D.1995); Matter of Estate of Erickson, 806 P.2d 1186, 1188 (Utah 1991), the requirement that the material provisions be in the testator's handwriting assumes that such action not only brings into contemplation the seriousness of the undertaking but also renders more difficult and unlikely the *84 possibility of forgery. See In re Towle's Estate, 14 Cal.2d 261, 93 P.2d 555, 561 (1939) (The handwriting requirement is an "adequate guaranty of its genuineness."); 1 Page on Wills, supra, § 1.3 (Some states permit holographic wills to be probated "[b]ecause of the additional guaranty of trustworthiness that is thought to exist in the complete use of handwriting."). Holographs become sufficient substitutes for more formally-witnessed wills in that there is the equal assurance, in both instances, that such instruments are not fraudulent, constitute solemn undertakings, and employ the words actually intended by their authors.
Our Legislature, in apparent contemplation that individuals might seek to avoid the cost of legal counsel, has permitted a less costly device to be utilized by allowing holographic wills to be probated.[2] There are no other options; indeed, the idea that a will may be created in some other or less reliable way than required by the statute constitutes a prodigious leap from the considered influence of many centuries of Anglo-American law.[3] Since the document in question is not sufficiently witnessed pursuant to N.J.S.A. 3B:3-2, it must either be found to be a holographic will or decedent must be deemed to have died intestate; there are not other alternatives.[4]

IV
N.J.S.A. 3B:3-3 provides that a will which fails to comply with N.J.S.A. 3B:3-2 "is valid as a holographic will, whether or not witnessed, if the signature and material provisions are in the handwriting of the testator." Since the signature affixed on the document is concededly decedent's, it *85 remains to be decided whether "the material provisions are in the handwriting of the testator."[5]
It is readily apparent, and not disputed, that the paragraphs of this document are either entirely pre-printed[6] or a mixture of both pre-printed material and decedent's handwriting. The pre-printed material, in fact, so predominates that no single paragraph is entirely handwritten.[7] Accordingly, it must be determined whether, as a matter of law, N.J.S.A. 3B:3-3 may be loosely applied to encompass a document containing material provisions which are both handwritten and pre-printed.
Courts have dealt with this question in the same or similar settings, with mixed results. For example, various decisions have been rendered concerning the significance of both handwriting and the making of obliterations on a photocopy of an earlier will,[8] printing rather than cursive writing,[9] the use of a typewriter or other similar device,[10] the use of ink or pencil,[11] and, as here, filling in the blanks of a pre-printed *86 will form.[12] Other interesting problems have arisen over the years. Some of these situations have proven particularly nettlesome in those jurisdictions where the statute permitting holographic wills requires that the entire document be in the handwriting of the decedent.[13]
For example, in Estate of Baker, 59 Cal.2d 680, 31 Cal.Rptr. 33, 381 P.2d 913 (1963), the testator wrote his will on paper embossed at the top with "AAA, Approved, Hotel Covell" (which testator drew lines through) and "Modesto, California" (which was not stricken). The court rejected the argument that the document could not be admitted to probate, concluding that the printed information was not material to the testamentary provisions of the document. Accord In re Schuh's Estate, 17 Ariz.App. 172, 496 P.2d 598 (1972) (handwritten material on stationery containing the following pre-printed material: "Bring's Funeral Home" and "My last will and testament"); In re Parsons' Will, 207 N.C. 584, 178 S.E. 78 (1935) (handwritten material on paper with the words "In the name of God, Amen" pre-printed at the top). The same result was reached in cases where testators wrote their wills on stationery bearing their own or their business's names and addresses. See Succession of Heinemann, 172 La. 1057, 136 So. 51 (1931); In re Lowrance's Will, 199 N.C. 782, 155 S.E. 876 (1930); In re Bennett's Estate, 324 P.2d 862 (Okla.1958).
Additional difficulties have been encountered where the testator did not fully date the document in his own handwriting but, rather, incorporated a pre-printed portion of a date. For example, in one case a testator used stationery with its location and a partial date already embossed ("Stockton, Calif. _____ 19____"). The testator, in his own hand, wrote "May 3" and "38" before and after the pre-printed "19." Notwithstanding California's statutory requirement that the document be dated in the testator's own handwriting, the court observed a growing tendency toward a liberal approach and admitted the writing to probate. In re Estate of Durlewanger, 41 Cal.App.2d 750, 107 P.2d 477, 479 (1940). Accord Jones v. Kyle, 168 La. 728, 123 So. 306 (1929); In re Yowell's Estate, 75 Utah 312, 285 P. 285 (1930); but see, In re Noyes' Estate, 40 Mont. 190, 105 P. 1017 (1909), and earlier California cases which took a more literal approach toward the governing statute than Durlewanger.[14]
These cases, and others, reveal that where a statute requires the entire document, including its date, to be in the handwriting of the testator, courts have, at times, managed to permit the probating of documents that literally do not conform to that direction. In short, these other jurisdictions appear to have adopted a standard which permits probate so long as those provisions which are material are in the handwriting of the testator. Thus, *87 through this case-by-case process, most of the jurisdictions governed by statutes requiring that the entire document be in the testator's handwriting have gradually moved toward applying the "material provisions" standard expressly adopted by legislatures in jurisdictions such as our own.

V
The cases discussed above, which dealt with "letterhead wills" or the partial use of a pre-printed date, appear to have followed two different philosophical approaches. The first suggests some consideration of the testator's probable intent with regard to the non-holographic material; the other approachthe surplusage theoryhas been described by the leading treatise as follows:
the surplusage test [requires that] the non-holographic material [be] stricken and the remainder of the instrument admitted to probate if the remaining provisions made sense standing alone. This is done even though the stricken non-holographic material was clearly intended to have been made part of the will as is the case where the will is made by filling in the blanks of a printed will form.
[2 Page on Wills, supra, § 20.5.]
The surplusage theory, however, has proven easier to describe than to consistently apply. That is, with regard to the "letterhead" and "date" cases briefly reviewed above, the disregarding of non-holographic material has had less impact upon the gist or substance of the instrument than on the respect due the applicable statute (which required the entire document and its date to be in the handwriting of the decedent).
Here, the question does not concern extraneous material found on hotel stationery or the use of a pre-printed "19" which the testator incorporated to form the year of the making of his holographic will. The more difficult problem, encountered here and by courts in other cases with mixed results,[15] is how to deal with a document containing substantive provisions which are partially pre-printed and partially handwritten.
In approaching this vexing problem, it is initially observed that our Legislature's adoption of N.J.S.A. 3B:3-3 undoubtedly suggests the employment of this surplusage standard. N.J.S.A. 3B:3-3 was based upon the then-existing version of Uniform Probate Code, § 2-503. The comment to this section of the Uniform Probate Code (UPC), in fact, describes the present situation and the application of the surplusage theory:
This section enables a testator to write his own will in his handwriting. There need be no witnesses. The only requirement is that the signature and the material provisions of the will be in the testator's handwriting, (rather than requiring, as some existing statutes do, that the will be "entirely" in the testator's handwriting) a holograph may be valid even though immaterial parts such as date or introductory words be printed or stamped. A valid holograph might even be executed on some printed will forms if the printed portion could be eliminated and the handwriting portion could evidence the testator's will.

[emphasis added.]
Since our Legislature adopted the holographic will standard contained in the *88 UPC, it must be assumed that it intended to have N.J.S.A. 3B:3-3 applied as the UPC's drafters intended. Accordingly, it logically follows that the surplusage theory should be applied.
That is, while our statute does not disqualify a holograph simply because portions are not in the testator's handwriting, it does require that only the testator's handwritten words be considered and that those words must be intelligible without resort to words not in the testator's handwriting. All other provisions, whether pre-printed, typed or written by others, are deemed surplusage and must be ignored.
In this case, an elimination of the pre-printed words renders the offered document meaningless. If all pre-printed material is removed, the document only states:
Ronald D. Ferree Ronald D. Ferree 40 Waterman Ave, Rumson N.J. 07760 There are no other rf rf rf[16] Micheal Ferree (Brother) 2981 Heather Court, Jensen Beach, Fla 34957 Barbra Ferree 2981 Heather Ct Court, Jensen Beach, Fla 34957 Charles Creel (my IRA at Smith Barney) 49 Parker Ave, Fair Haven NJ Micheal Ferree Barbra Ferree 21st October 99 Ronald D. Ferree Ronald D. Ferree
As can readily be seen, the handwritten portions of this documentstanding alonemean nothing. The pre-printed verbs, the pre-printed punctuation, the pre-printed directions and the pre-printed testamentary language are essential if this document is to have any meaning. Material language, necessary to provide meaning and necessary to reveal the writer's testamentary intent,[17] is not in decedent's handwriting. As such, this document cannot be considered a holographic will. This court can come to no other conclusion without doing great violence to the meaning of N.J.S.A. 3B:3-3. While courts of other jurisdictions have found meaning despite the ignoring of pre-printed language in other documents, the document at hand simply does not permit any rationale interpretation when its pre-printed portions are disregarded. Any attempt to wring meaning inevitably requires resort to the pre-printed portionsa wholly impermissible approach.[18]
*89 Our Legislature has adopted procedures governing the manner in which its citizens may distribute property upon death. This court is bound to enforce those laws. If the material provisions of the document are in the handwriting of the testator than the document may be admitted to probate as a holographic will; if not, then there must be two witnesses to the testator's execution of the document. Here, neither of these choices has been presented. If it makes sense for a document such as that in question to be admitted to probate, it is up to the Legislature to say so.[19]

VI
Notwithstanding the obvious thrust of N.J.S.A. 3B:3-3, the meaning of its terms, and the failure of this document to meet those terms, plaintiff contends that a liberal view should be taken to allow for the vindication of what he claims to be the decedent's alleged intentions. While this court disagrees that any liberality can be permitted beyond the application of the "surplusage" theory, plaintiff's approach misunderstands the "substantial compliance" doctrine.
That is, at times, our courts will allow for the probating of a document which does not precisely fit the literal meaning of N.J.S.A. 3B:3-2. In other words, a will may be admitted to probate if it substantially, if not entirely, complies with N.J.S.A. 3B:3-2. However, while this doctrinefirst applied in this State in Will of Ranney, 124 N.J. 1, 589 A.2d 1339 (1991)permits the curing of an inequity caused by the "harsh and relentless formalism" of the law of wills, it does not allow for the studied disregard of the formalities (or the informalities permitted with holographic wills) still required by statute. In Ranney, Justice Pollock explained the continued importance of the existing statutory formalities:
The primary purpose of those formalities is to ensure that the document reflects the uncoerced intent of the testator. Requirements that the will be in writing and signed by the testator also serve an evidentiary function by providing courts with reliable evidence of the terms of the will and of the testamentary intent. Additionally, attestation requirements prevent fraud and undue influence. Further, the formalities perform a "channeling function" by requiring a certain degree of uniformity in the organization, language, and content of wills. Finally, the ceremony serves as a ritual that impresses the testator with the seriousness of the occasion.
[124 N.J. at 11-12, 589 A.2d at 1344 (citations omitted).]
Notwithstanding, Ranney observed that "rigid insistence" upon these formalities can frustrate the statute's very purpose and recognized the irony of "insist[ing] on literal compliance with statutory formalities when that insistence would invalidate a will that is the deliberate and voluntary act of the testator." 124 N.J. at 12, 589 A.2d at 1344. As a result, the Court held that "[w]hen formal defects occur" a will proponent may succeed if it can be shown "by clear and convincing evidence that the will substantially complies with statutory requirements." Id. at 14, 589 A.2d at 1345.
*90 The purpose of the substantial compliance doctrine is not to overthrow the statutory requirements but "to remove procedural peccadillos as a bar to probate." 124 N.J. at 14, 589 A.2d at 1345. In Ranney, the witnesses signed an attached self-proving affidavit but not the will itself. The surrogate ordered probate of the will but the trial court disagreed; the Appellate Division reversed the trial court, finding that the self-proving affidavit formed part of the will and the execution of the self-proving affidavit met the statute's requirements that the witnesses sign the will. Because the Supreme Court disagreed with the Appellate Division that the location of the witnesses' signatures met the statutory requirements, it determined, through reliance on the substantial compliance doctrine, that the instrument might nevertheless be admitted to probate. Accordingly, the matter was remanded to the trial court, giving the proponent the opportunity to attempt to demonstrate that the proffered instrument was the will of the decedent, that he signed it voluntarily, that the witnesses signed at the decedent's request and that the proponent was unaware of the existence of any other will. 124 N.J. at 15, 589 A.2d at 1346.
To obtain a true understanding of the scope of the substantial compliance doctrine, the holding in Ranney should be compared to the Court's decision a few years earlier in Matter of Estate of Peters, 107 N.J. 263, 526 A.2d 1005 (1987). There, the Court refused to apply the substantial compliance doctrine even when the evidence demonstrated the witnesses may have observed the execution of the will, because the witnesses never signed the will. 107 N.J. at 274-75, 526 A.2d at 1010-11.[20]See also In re Estate of Gerhardt, 336 N.J.Super. 157, 763 A.2d 1289 (Ch.Div. 2000) (substantial compliance found when the signatures of a witness and a notary public were affixed to the instrument). As can be seen from these cases, the substantial compliance doctrine recognized by Ranney has not swallowed up the requirements of the statute. As Ranney emphasized:
The execution of a last will and testament, however, remains a solemn event. A careful practitioner will still observe the formalities surrounding the execution of wills.
[124 N.J. at 14, 589 A.2d at 1345.]
Experience demonstrates that careful practitioners still observe the formalities in the wake of Ranney and resort to the *91 substantial compliance doctrine is infrequent at best. Indeed, as expressed in Peters, "it is arguable that as the number of formalities have been reduced, those retained by the Legislature have assumed even greater importance, and demand at least the degree of scrupulous adherence required under the former statute." 107 N.J. at 274, 526 A.2d at 1010.
The contention that holographs should also be permitted if there has been substantial compliance with the statute should be rejected. Our Legislature has allowed for holographic wills because they represent an adequate guaranty that a handwritten document is not a forgery and the creation of such a document constitutes the solemn act of the testator. That is, a holographic will is in itself a step away from formality. To now suggest that this exception to formality should be further watered down by a "substantial compliance" approacheven after the utilization of the "surplusage" standardrepresents a dangerous step away from what the Legislature intended. While our Legislature is free to adopt a more relaxed approachand may in fact do so in the near future, see, n. 19, supra[21]it is, until then, not the role of this court to depart from the Legislature's considered directions regarding holographic wills.

VII
For these reasons, the document which plaintiff would have admitted to probate does not qualify as a holographic will. The complaint will be dismissed.
*92 APPENDIX

*93 
NOTES
[1] If the proffered document is to be credited, it should be observed that the first numbered paragraph states: "I hereby revoke any and all Wills and Codicils by me anytime heretofore made. There are no other" (the emphasized portion was handwritten; the other was pre-printed).
[2] The idea that expenses will be saved in opting for a self-made holographic will does not always prove correct. Such documents often lead to litigation, and the savings generated by the avoidance of an attorneys' fee on the front-end are often swallowed up by the sometime exorbitant financial burden of counsel fees incurred in the litigation at the back-end. In the words of the grizzled car mechanic in an old commercial extolling the virtues of frequent auto maintenance, "you can pay me now or ... pay me later."
[3] American probate law is heavily influenced by English law as it existed even prior to the Norman Conquest. Except in states which were originally French settlements, the English influence on probate law continued well after the American Revolution. Despite the overriding impact of English law, however, the holographic will is the product of French law; section 970 of the Code of Napoleon states: "An holographic testament shall not be valid, unless it be written entirely, dated and signed by the testator with his own hand; it is subjected to no other form." See, 2 Page on Wills, supra, § 20.2.
[4] In the past, wills that were in part oral were permitted. These nuncupative wills could be spoken by the testator; however, to be effective, a nuncupative will had to be made during a "last sickness" in the presence of a certain number of witnesses and later reduced to writing within a given period of time after orally pronounced. As described by Blackstone: "The testamentary words must be spoken with an intent to bequeath, not any loose, idle discourse in his illness, for he must require the bystanders to bear witness of such his intention; the will must be made at home or among his family or friends, unless by unavoidable accidents, to prevent impositions from strangers; it must be his last sickness, for, if he recovers, he may alter his dispositions and has time to make a written will; it must not be proved at too long a distance from the testator's death, less the words should escape the memory of the witnesses, nor yet too hastily and without notice, less the family of the testator should be put to inconvenience or surprised." See Male's Case, 49 N.J.Eq. 266, 277, 24 A. 370, 374 (Prerog.Ct.1892); Carroll v. Bonhan, 42 N.J.Eq. 625, 9 A. 371 (Prerog.Ct.1887). This device existed by operation of English law in Colonial times (and later adopted in New Jersey by statute). Such statutes limited the amount and kind of property that could be so passed. Our Legislature abolished nuncupative wills in 1951. See Foster v. Reiss, 18 N.J. 41, 54, 112 A.2d 553, 561 (1955).
[5] Besides the long-abolished nuncupative will provision, see n. 4, supra, and the exception for "soldier's wills," New Jersey did not adopt a statute which permitted the probate of unwitnessed documents until 1978. Prior to that time, and apparently as early as 1795, unwitnessed "soldier's wills" could be probated. Such an exception existed in both English and Roman law. The traditional requirement was that the testator actually be in active military duty during a time of war, a provision later expanded in this State to require that the testator be in active military duty "in time of war or in time of emergency or in time of warlike conditions." See N.J.S.A. 3A:3-5 (repealed when holographic wills were first permitted in 1978). The expansion beyond "times of war" to include "emergency or warlike" conditions appears to have been a reaction to the suggestion, rejected in In re Knight's Estate, 11 N.J. 83, 85, 93 A.2d 359, 360 (1952), that the Korean War was a "police action," and not a "war," and a soldier then in active duty could not take advantage of N.J.S.A. 3A:3-5. A 1967 amendment to this statute also expressly directed that the undeclared war in Vietnam was included within the phrase "in time of warlike conditions."
[6] The document consists of six numbered paragraphs. The second and third paragraphs are entirely pre-printed, although the decedent apparently initialed those paragraphs. The sixth paragraph is entirely pre-printed but not initialed.
[7] A copy of this document is appended to this opinion.
[8] In re Estate of Foxley, 254 Neb. 204, 575 N.W.2d 150 (1998), reversing, 6 Neb.App. 1, 568 N.W.2d 912 (1997).
[9] Matter of Estate of Hand, 295 N.J.Super. 33, 684 A.2d 521 (Ch.Div.1996) (printing by the testator was sufficient; there is no requirement that "handwriting" be equated with cursive writing).
[10] A typewritten copy of an alleged holographic will does not meet the handwriting requirement. Scott v. Gastright, 305 Ky. 340, 204 S.W.2d 367 (1947) (testator dictated instructions which were typed by another; testator died that day, never having seen the typewritten will but wrote on a separate piece of paper, "the Will I dictated to L. Schear, Att'y, but did not sign is my last will and as I wish it"); accord In re Smith's Estate, 31 Cal.2d 563, 191 P.2d 413, 415 (1948); In re Bauer's Estate, 5 Wash.2d 165, 105 P.2d 11, 14 (1940). The leading commentators also refer to a Scottish caseM'Beath v. M'Beathwhere the testator was physically incapable of writing; the court permitted the document to be admitted to probate as a holograph although it "looked as though the testator [was] trying deliberately to raise a difficult legal question." 2 Page on Wills, supra, § 20.5.
[11] The authors of Page on Wills thoroughly canvassed this subject and summarized that "[t]he will may be written in lead pencil, or partly in lead pencil or partly in ink. It may be written in different kinds of ink." 2 Page on Wills, supra, § 20.5 at 285.
[12] Estate of Muder, 159 Ariz. 173, 765 P.2d 997 (1988), approaching the matter from a standpoint of the testator's intent and the probable absence of fraud, found that filling in blanks on a will form created a valid holographic will. Accord the California Supreme Court's sharply divided ruling in Estate of Black, 30 Cal.3d 880, 181 Cal.Rptr. 222, 641 P.2d 754 (1982), as well as Succession of Burke, 365 So.2d 858 (La.App.1978); Watkins v. Boykin, 536 S.W.2d 400 (Tex.Civ.App.1976). A contrary result is suggested by Foxley, supra, 254 Neb. 204, 575 N.W.2d 150.
[13] Such statutes are based upon the original requirement of the Code of Napoleon that the entire document be written, dated and signed in the testator's hand. See n. 3, supra.
[14] See In re Estate of Billings, 64 Cal. 427, 1 P. 701 (1884); In re Estate of Plumel, 151 Cal. 77, 90 P. 192 (1907); In re Estate of Francis, 191 Cal. 600, 217 P. 746 (1923).
[15] Compare Foxley, supra, 254 Neb. 204, 575 N.W.2d 150, which utilized the surplusage test in the same manner as applied herein, with Muder, 159 Ariz. 173, 765 P.2d 997, which applied an "intent approach" in determining that a testator's filling in of the blanks in a pre-printed will form constituted sufficient conformance to the statute.
[16] The three "rf" notations contained in the document appear to be decedent's initials, handwritten alongside the first three numbered pre-printed paragraphs.
[17] While there are few New Jersey decisions which discuss holographic wills, there is no question but that our appellate courts have repeatedly emphasized that it is crucial that a decedent's handwritten document express a testamentary intent. See, Matter of Will of Smith, 108 N.J. 257, 262, 528 A.2d 918, 920-21 (1987) ("Although the Wills Act recognizes holographic wills as valid, whether witnessed or not, nothing suggests that the Legislature intended to eliminate testamentary intent either for a holographic or for a more formally executed will. To the contrary, the Wills Act contemplates that testamentary intent is a requirement of both forms of wills."); Simonelli v. Chiarolanza, 355 N.J.Super. 380, 810 A.2d 604 (App.Div.2002).
[18] This conclusion is not inconsistent with In re Estate of Cunningham, 198 N.J.Super. 484, 487 A.2d 777 (Law Div.1984) where the court found that a document qualified as a holographic will even though pre-printed statements were contained at the beginning and end of the document. The will contained a pre-printed "In the name of God, Amen" and, after a space where the decedent wrote his name and social security number, the following pre-printed material appeared: "being of sound mind, memory and understanding, do make and publish this my Last Will and Testament, in manner following, that is to say." After that, "in the total handwriting of the decedent," were directions understandable standing alone. 198 N.J.Super. at 485, 487 A.2d at 778. Unlike Cunningham, the alleged holograph at hand is simply unintelligible without resort to the pre-printed words.
[19] It is interesting that a proposal to revise Title 3B presently awaiting further action in the State Assembly might, if passed and ultimately signed into law, provide for the admission of this document. This proposal would add the following language to our current statute: "Intent that the document constitutes the testator's will can be established by extrinsic evidence, including, for writings intended as wills portions of the document that are not in the testator's handwriting."
[20] In speaking for the Court, Justice Handler stressed the importance of a solemn fulfillment of those requirements which the Legislature has left in place: "The observatory function consists of the actual witnessingthe direct and purposeful observationof the testator's signature to or acknowledgement of the will. It entails more than physical presence or a casual or general awareness of the will's execution by the testator; the witnessing of a will is a concomitant condition and an integral part of the execution of the will. The signatory function consists of the signing of the will by the persons who were witnesses. The signatory function may not have the same substantive significance as the observatory function, but it is not simply a ministerial or precatory requirement. While perhaps complementary to the observatory function, it is nonetheless a necessary element of the witnessing requirement. The witness' signature has significance as an evidentiary requirement or probative element, serving both to demonstrate and to confirm the fulfillment of the observatory function by the witnesses. There is nothing, therefore, to suggest that in retaining the requirement that a will's execution be witnessed, the Legislature meant to imply that either witnessing function is dispensable. The statutory policy to reduce the required formalities to a minimum should not, in our view, be construed to sanction relaxation of the formalities the statute retained." 107 N.J. at 274-75, 526 A.2d at 1010-11 (emphasis added).
[21] While the proposed amendment to Title 3B in this regard might permit the probating of many documents which do constitute the actual testamentary intent of an individual, the well-intended loose standard proposedby permitting the consideration of "extrinsic evidence"could very well lead to an atmosphere which would permit, despite all good intentions, "fraud by the living upon the dead" that Judge Clapp wrote of 50 years ago. See Taylor, supra, 28 N.J.Super. at 225, 100 A.2d at 348. Any departures from the bright line rules presently contained in N.J.S.A. 3B:3-2 and 3-3 come fearfully close to supplanting the decedent's direction with a gestalt resolution by the probate judge. At the very least, the adoption of the proposal referred to in n. 19, supra, would undoubtedly cause a proliferation of litigation.