771 A.2d 1141

SIMONE GALIK, EXECUTRIX OF THE ESTATE OF VIVIAN GA-LIK, HER MOTHER, DECEASED AND SIMONE GALIK, INDI-VIDUALLY, PLAINTIFF–APPELLANT, v. CLARA MAASS MED-ICAL CENTER A HOSPITAL CORPORATION, ITS SERVANTS, AGENTS, OR EMPLOYEES, JOSEPH M. FUSCO, M.D., RICH-ARD ROE, JANE DOE AND MARY ROE, (FICTITIOUS NAMES INTENDING TO DESIGNATE PHYSICIANS AND/OR NURSES

INVOLVED IN THE CARE, MANAGEMENT, DIAGNOSIS, AND TREATMENT) AND EACH OF THEM JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFENDANTS, AND MATTHEW DELUCA, M.D., KESHAVMURTHY SHIVASHANKAR, M.D., ROBERT ACOSTA, M.D., DAVID GREIFINGER, M.D. AND EDWIN GANGEMI, M.D., DEFENDANTS–RESPONDENTS.

Argued January 29, 2001—Decided May 10, 2001.

*Terry L. Shapiro* argued the cause for appellant (*Mandel Berezin Shapiro & Sawyer,* attorneys).

*Edward J. Dauber* argued the cause for respondents Matthew DeLuca, M.D., Keshavmurthy Shivashankar, M.D., Robert Acosta, M.D. and David Greifinger, M.D. (*Greenberg, Dauber, Epstein & Tucker,* attorneys; *Michael J. Lunga, David P. Weeks* and *James R. Korn,* of counsel; *Karen M. Lerner, Susan A. Dragone, Michael R. Ricciardulli* and *Julia A. Klubenspies,* on the briefs).

*Kenneth M. Brown* argued the cause for respondent Edwin Gangemi, M.D. (*Reiseman Sharp Kelsey & Brown,* attorneys; *Jane S. Kelsey,* of counsel; *Everett E. Gale, III,* on the brief).

The opinion of the court was delivered by

LONG, J.

We are called upon once more to evaluate the sufficiency of a plaintiff's conduct in attempting to satisfy the Affidavit of Merit statute. *N.J.S.A.* 2A:53A–27.

I

On December 26, 1995, eighty-year-old Vivian Galik slipped and fell in her kitchen, striking the back of her head and her neck on a radiator. She was taken to the Emergency Department of Clara Maass Medical Center, and later admitted. Galik was treated at Clara Maass by Dr. Robert Acosta (radiologist), Dr. Matthew DeLuca (neurologist), Dr. Edwin Gangemi (physiatrist), Dr. David Greifinger (orthopaedist), and Dr. Keshavmurthy Shivashankar (primary care/internist). During the weeks she spent at the Hospital, Galik progressively lost function in her limbs. She was discharged on January 31, 1996 "virtually quadriplegic [and] requiring total care." On February 23, 1996, Galik was admitted to Mountainside Hospital where she was diagnosed with a fractured

cervical spine. She died of pneumonia and respiratory arrest on February 29, 1996.

Galik's daughter, Simone, the executrix of her estate, retained an attorney to investigate the possibility of instituting a malpractice action in connection with her mother's death. The attorney, in turn, provided Mrs. Galik's records to a Board Certified Neurosurgeon, Dr. Francis J. Pizzi. Pizzi prepared a report for the lawyer on November 11, 1996 that stated:

It is my considered medical opinion that there was a substantial deviation from the standard of medical care given to this patient at the Clara Maass Medical Center. The correct diagnosis at that time was fractured cervical spine with instability. The x-rays of the cervical spine taken were only two views. Flexion/extension x-rays were not taken to see if there was an unstable spine to account for her neurological picture. In that the clinical presentation was suggestive of a brachial plexus injury this oversight (not taking flexion/extension views) may be excusable. An MRI scan of the cervical spine was ordered on ⅕ but not performed until 1/6. This, by my review as well as in the radiologist's report, shows a subluxation of C5 on C6 with a severe compromise of the spinal canal at that level. This study has motion artifact but still is very suggestive of dislocation. This very worrisome finding went unrecognized by all the physicians caring for her. On 1/11/96 she began showing signs of progression of her spinal cord injury when she required straight catheterization for her urine and then the installation of an indwelling Foley catheter. Both the neurologist and the orthopaedist found that her neurological status had changed with her unable to move her legs and her upper extremity. This is documented also by the Rehabilitation Department where the motor power in both lower extremities is zero over five and in the upper extremities proximal motions are one out of five on the right, two out of five on the left and zero out of five in the more distal arm muscles. Despite this dramatic change in status still no one has put this together with the subluxation seen at the C5–C6 level on the MRI scan done two days before she became quadriplegic. This is inexcusable.

When the MRI report and films became available on 1/6/96 the patient was still neurologically quite viable and had she been evaluated and treated appropriately then she would not have become essentially quadriplegic and helpless, which condition led to her demise. Upon getting the results of the MRI scan a repeat MRI with sedation to minimize the motion artifact was an option as was a cervical spine series with lateral flexion and extension views or a CT scan of the cervical spine. This would have identified the dislocation and unstable spine at the C5–C6 level. Appropriate treatment to stabilize her spine would have prevented her subsequent spinal cord damage which led to her severe quadriparesis and death.

In a supplemental report dated March 12, 1997, Dr. Pizzi added particularized allegations against Doctors DeLuca, Greifinger and Shivashankar by name:

I carefully reviewed the Clara Maass Medical Center records on the above mentioned patient once again.

Once again, I do feel that there was substantial deviation from the standard of care in the treatment of this patient.

Her attending physician, Dr. K. Shiva[shankar], failed to recognize that this patient had a cerival fracture dislocation and as a result of her lack of treatment for this she became quadriplegic during her hospital stay and subsequently died as a result of complications that elderly quadriplegics get. An MRI scan was ordered by the neurologist on 1/5 but, according to the MRI report, the transcription was not done until 1/9. On 1/10 Dr. Shiva[shankar] wrote an order to "get results of MRI scan." The report clearly states that there is fracture dislocation at the C5–C6 level but the study is limited. There is no indication in the records that Dr. Shiva[shankar] did in fact get the results of the MRI scan and acknowledge that there was an abnormality which required treatment.

Dr. DeLuca, the neurologist, ordered the MRI scan of the cervical spine yet did not follow through on obtaining the results and recommending appropriate treatment for this. The findings on the MRI scan more than accounted for the patient's symptoms of pain in her neck and findings on examination of weakness of her right extremity, all occurring as a result of head and neck trauma in an elderly person.

Dr. Greifinger, the orthopaedist, also in his notes indicated that he would be interested to see the results of the MRI scan of her cervical spine yet no follow-up on his part was done to get the results of the MRI scan so that appropriate treatment could be rendered for her fracture dislocation.

The Progressive Imaging Center did perform an MRI scan on 1/5/96. The report was transcribed on 1/9/96 and I presume transferred to the hospital on 1/10/96 at the request of Dr. Shiva[shankar]. The four day gap in transcribing this report and getting the information to the hospital is a substantial deviation in a patient with neck trauma with neurological deficit who has an abnormal cervical spine examination. Dr. Fusco,[1] the radiologist who read the study at some time between 1/5/96 and 1/9/96 when it was transcribed, deviated from the standard of care in not verbally reporting by telephone to either the attending physician or the consultants that there was a fracture dislocation at the C5–C6 level in a patient who was suspected of having a cervical spine injury.

By letter dated July 29, 1997, plaintiff's counsel forwarded Dr. Pizzi's reports to Princeton Insurance Company, the carrier for Doctors Gangemi and Greifinger, and Medical Inter–Insurance Exchange of N.J., the carrier for Doctors Acosta, DeLuca and Shivashankar, simultaneously advising the carriers of his client's demand for a "global settlement" for Mrs. Galik's "conscious pain and suffering" and "premature, untimely wrongful death." The

---

[1] Dr. Fusco, who was added to the Complaint by amendment and later dismissed on statute of limitations grounds, is not the subject of this opinion.

July 29, 1997 letter specifically names all five of the physicians who treated Mrs. Galik:

Enclosed herewith you will please find the report of Dr. Francis Pizzi, neurosurgeon, dated November 11, 1996.

Dr. Pizzi discusses the medical negligence of *Dr. Acosta (radiologist) Dr. Shivashankar (primary physician) Dr. DeLuca (neurologist) Dr. Greifinger (orthopaedist) and Dr. Gangemi (physiatrist).*

In the opinion of Dr. Pizzi, Ms. Galik died based upon the failure of each specialist to diagnose the subluxations of the cervical, vertebral unstable spine resulting in the spinal cord lesion quadraplegia [sic] and death.

[Emphasis added.]

Again on October 8, 1997, plaintiff's counsel notified the insurance carriers by letter of plaintiff's intent to file suit "unless this matter is amicably resolved by October 23, 1997" and again enclosed a copy of Dr. Pizzi's March 12 report.

Efforts to settle the case were unsuccessful and on November 19, 1997, plaintiff, Simone Galik, individually and as executrix of the estate of her mother, filed a malpractice action against Drs. Acosta, DeLuca, Gangemi, Greifinger and Shivashankar, the hospital and a number of John Doe defendants, alleging malpractice. Doctors DeLuca and Greifinger answered on January 13, 1998, Dr. Acosta on January 26, 1998, Dr. Gangemi on March 10, 1998, and Dr. Shivashankar on March 23, 1998. Drs. Acosta, DeLuca, Gangemi and Greifinger filed motions to dismiss based on plaintiff's failure to provide an affidavit of merit as required by *N.J.S.A.* 2A:53A–27.

On May 28, plaintiff filed a cross-motion for a sixty-day extension within which to file the affidavit. Plaintiff argued that the motion was made within the 120–day window provided in *N.J.S.A.* 2A:53A–27 relative to Drs. Gangemi and Shivashankar and that, in any event, Dr. Pizzi's reports, served on the carriers long before the filing of the complaint, constituted substantial compliance with the Affidavit of Merit statute. In addition, on that date, plaintiff served all parties with Dr. Pizzi's reports in connection with answers to interrogatories.

On June 2, 1998, before the trial court ruled on the pending motions, plaintiff filed and served an affidavit of merit completed by Dr. Pizzi. That affidavit provided in pertinent part:

Based upon the record of hospital confinement of the Plaintiff's decedent at Clara Maass Medical Center from December 26, 1995 to January 31, 1996 and at Mountainside Hospital from February 23 to the date of her death on February 29, 1996, I have concluded that there is a reasonable medical probability that there was a [deviation] from the accepted standards of care, treatment, observation and medical management of Plaintiff's decedent, Vivian Galik by the Defendants, Edmond [sic] Gangemi, M.D. (Physiatrist), Matthew DeLuca (Neurologist), Robert Acosta, M.D. (Radiologist), David Greifinger, M.D. (Orthopedist), Keshavmurthy Shivashankar, M.D. (Internist), and that such deviation resulted in the failure to diagnose and treat the decedent's spinal cord lesion caused by a fracture dislocation and or subluxation of the vertebrate from C5 onto C6 and resulted in progressive quadriparesis, pulmonary infection and pneumonia, and respiratory arrest and death on February 29, 1996.

On June 26, 1998, the trial court dismissed the complaint against Drs. Acosta, DeLuca, Gangemi and Greifinger based on plaintiff's failure to file an affidavit of merit or seek an extension therefrom within sixty days of the answers filed by those defendants. The trial court denied plaintiff's request for an extension or, in the alternative, a finding of substantial compliance. In addition, the trial court held that dismissal regarding defendants Acosta and Gangemi was warranted on substantive grounds because plaintiff's unsworn expert reports failed to sufficiently indicate that Doctors Acosta and Gangemi deviated from accepted standards of medical care. Thereafter, Dr. Shivashankar filed a similar motion to dismiss that was granted. On January 22, 1999, Clara Maass Medical Center was also dismissed. Plaintiff appealed from the dismissals of Doctors Acosta, DeLuca, Gangemi, Greifinger and Shivashankar and we directly certified the appeal. 165 N.J. 525, 760 A.2d 780 (2000).

Plaintiff now contends that service of two expert reports on defendants' medical malpractice insurance carriers before the filing of the complaint constitutes substantial compliance with N.J.S.A. 2A:53A–27. Alternatively, plaintiff contends that counsel's "good faith belief that the spirit of the statute had been satisfied [by service on the carriers] and that no motion would be

filed to dismiss the complaint for failing to put the opinion of Dr. Pizzi in affidavit form" demonstrated "extraordinary circumstances."

## II

N.J.S.A. 2A:53A–27 provides:

In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an *affidavit* of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

The purpose underlying the statute has been fully explicated in our recent decisions. *Burns v. Belafsky*, 166 *N.J.* 466, 474–75, 766 *A.*2d 1095 (2001) and *Cornblatt v. Barow*, 153 *N.J.* 218, 242, 708 *A.*2d 401 (1998). It was designed as a tort reform measure and requires a plaintiff in a malpractice case to make a threshold showing that the claims asserted are meritorious. It is designed to weed out frivolous lawsuits at an early stage and to allow meritorious cases to go forward. *Cornblatt, supra,* 153 *N.J.* at 242, 708 *A.*2d 401. *See generally* Peter Verniero, Chief Counsel to the Governor, Report to the Governor on the Subject of Tort Reform (Sept. 13, 1994) (noting that "[r]epresentatives of hospitals, medical professionals, and medical-malpractice insurers support[ed] the certificate-of-merit requirement as a way of weeding out meritless lawsuits (and of identifying truly culpable defendants)"). Here we are faced with the issue of whether plaintiff's conduct before and after filing of the complaint either satisfied the Affidavit of Merit statute directly or complied with it substantially. Because different legal standards apply to various defendants, we will serially address the issues on the basis of the circumstances germaine to the various defendants.

## III

█ In *Burns v. Belafsky,* a case decided after the trial court proceedings in this matter, we rejected a defendant's contention that an application for a sixty-day extension must be made within the first sixty-day period prescribed by the statute, declining to superimpose that precondition on the statute because it would neither advance the legislative purpose nor conform with well-established principles of statutory interpretation. *Burns, supra,* 166 *N.J.* at 475–77, 766 *A.*2d 1095. Accordingly, if a plaintiff files a motion to extend time, establishing good cause for the late filing, and also files an affidavit of merit within the overall 120–day window provided in *N.J.S.A.* 2A:53A–27, those actions will be deemed timely.

█ Here, within 120 days of the answers of Drs. Gangemi and Shivashankar, plaintiff moved for an extension on the ground that the expert report, in unsworn form, had not only been served on defendants' carriers prior to the filing of suit, but was the basis of ongoing settlement negotiations. In the face of those conceded facts, good cause for late filing was established and the affidavit of merit filed and served therewith was timely under *Burns.* The complaint against Doctors Gangemi and Shivashankar thus should not have been dismissed.

## IV

Neither plaintiff's motion for an extension nor the affidavit of merit was filed within 120 days of the answers of Drs. Acosta, DeLuca and Greifinger. Thus, whether the claims against those physicians can survive defendants' motions to dismiss will depend on whether Dr. Pizzi's unsworn reports that were served on the carriers constitute substantial compliance with the statute.

█ The equitable doctrine of substantial compliance has deep roots in English common law, *Neil v. Morgan,* 28 *Ill.* 524, 1862 WL 3359, at *3 (1862), and has received

repeated recognition in our own cases (*McCarty v. Boulevard Comm'rs of Hudson Co.*, 91 *N.J.L.* 137, 142, 106 *A.* 219 (Sup.Ct.1918), *aff'd*, 92 *N.J.L.* 519, 106 *A.* 891 (E. & A.1918); *Travis v. Highlands*, 136 *N.J.L.* 199, 202, 55 *A.*2d 109 (Sup.Ct.1947) as well as in cases elsewhere. *See Ray v. City of Birmingham*, 275 *Ala.* 332, 154 *So.*2d 751, 752–753 (1963); *Burmek v. Miller Brewing Co.*, 2 *Wis.*2d 330, 86 *N.W.*2d 629, 630–631 (1958); *Brickell v. Kansas City, Mo.*, 364 *Mo.* 679, 265 *S.W.*2d 342, 344–345 (1954); *Perry v. City of High Point*, 218 *N.C.* 714, 12 *S.E.*2d 275, 278 (1940); *cf. Giovanniello v. City of New York*, 163 *Misc.* 868, 296 *N.Y.S.* 886, 888 (Sup.Ct.1936); *Knight v. City of New York*, 249 *App. Div.* 635, 291 *N.Y.S.* 291, 292 (1936).

[*Zamel v. Port of N.Y. Auth.*, 56 *N.J.* 1, 5–6, 264 *A.*2d 201 (1970).]

Its purpose is to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose. *Anske v. Borough of Palisades Park*, 139 *N.J.Super.* 342, 347, 354 *A.*2d 87 (App.Div.1976). It is a doctrine based on justice and fairness, designed to avoid technical rejection of legitimate claims. *Zamel, supra*, 56 *N.J.* at 6, 264 *A.*2d 201.

In *Zamel, supra*, we resorted to the doctrine of substantial compliance to excuse the failure of the plaintiff to file a timely notice of claim with a public agency where that agency had in hand, within the 60–day period provided by statute, substantially all of the information that would have been provided in the notice. 56 *N.J.* at 7, 264 *A.*2d 201. Rejecting defendant's contention that substantial compliance is inapplicable to a claim with respect to which notice is a statutory pre-condition to the maintenance of suit, we stated:

> In any event the matter before us is simply one of legislative understanding and contemplation; we find nothing whatever in the pertinent statutory history or terminology to indicate that our Legislature ever meant to exclude the highly just doctrine of substantial compliance which is so well designed to avoid technical defeats of valid claim. *Cf. City of Birmingham v. Hornsby*, 242 *Ala.* 403, 6 *So.*2d 884 (1942):
>
> > Our authorities are uniform to the effect that technical accuracy is not required. Substantial compliance suffices. There was no intention on the part of the law makers that such a statute should be used as a stumbling block or pitfall to prevent recovery by meritorious claimants.
>
> [*Id.* at 6, 264 *A.*2d 201.]

Since then the doctrine has been applied by our courts in a wide array of contexts. *See Negron v. Llarena*, 156 *N.J.* 296, 305, 716 *A.*2d 1158 (1998) (finding widow's wrongful death action timely

filed where she substantially complied with Wrongful Death Act statute of limitations); *In re Will of Ranney,* 124 *N.J.* 1, 11–15, 589 *A.*2d 1339 (1991) (invoking doctrine of substantial compliance to find that will may be admitted to probate under circumstances where it does not literally comply with statutory attestation requirements); *Cole v. Township of Roxbury,* 257 *N.J.Super.* 108, 116, 607 *A.*2d 1366 (App.Div.1992) (holding township's chief financial officer substantially complied with statutory requisites for achieving tenure pursuant to *N.J.S.A.* 40A:9–140.8); *Stegmeier v. St. Elizabeth Hosp.,* 239 *N.J.Super.* 475, 481–83, 571 *A.*2d 1006 (App.Div.1990) (finding substantial compliance with time requirements on service of motion for new trial where motion was timely filed and delivered to independent messenger service within ten-day time period); *Gerzsenyi v. Richardson,* 211 *N.J.Super.* 213, 217, 511 *A.*2d 699 (App.Div.1986) (applying doctrine of substantial compliance where motion for trial *de novo* was filed one business day late); *Speer v. Armstrong,* 168 *N.J.Super.* 251, 257, 402 *A.*2d 963 (App.Div.1979) (finding third-party action filed by non-public defendants constituted substantial compliance with plaintiff's notice requirement under the Tort Claims Act); *Bernstein v. Board of Trustees of the Teachers' Pension and Annuity Fund,* 151 *N.J.Super.* 71, 76, 376 *A.*2d 563 (App.Div.1977) (holding former teacher, who filed application for disability retirement benefits 26 days late substantially complied with statutory requisites).

■ To be sure, not every non-complying act is salvageable under the substantial compliance doctrine. In *Bernstein, supra,* where the doctrine was invoked by the court in the pension context, its elements were set forth with specificity:

A canvass of the cases dealing with the application of the equitable doctrine of substantial compliance indicate the following considerations: (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute. *See generally, Zamel v. Port of N.Y. Auth.,* 56 *N.J.* 1, 264 *A.*2d 201 (1970); *McCarty v. Boulevard Commr's of Hudson Cty.,* 91 *N.J.L.* 137, 142, 106 *A.* 219 (Sup.Ct.1918), *aff'd* 92 *N.J.L.* 519, 106 *A.* 891 (E. & A.1918); *Travis v. Highlands,* 136 *N.J.L.* 199, 202, 55 *A.*2d 109 (Sup.Ct.1947); *Ray v. City of Birmingham,* 275 *Ala.* 332, 154 *So.*2d 751, 752–753 (Sup.Ct.1963);

*Burmek v. Miller Brewing Co.*, 2 *Wis.*2d 330, 86 *N.W.*2d 629, 630–631 (Sup.Ct. 1958); *Brickell v. Kansas City, Mo.*, 364 *Mo.* 679, 265 *S.W.*2d 342, 344–345 (Sup.Ct.1954); *Perry v. City of High Point*, 218 *N.C.* 714, 12 *S.E.*2d 275, 278 (Sup.Ct.1940).

[151 *N.J.Super.* at 76–77, 376 *A.*2d 563.]

Satisfying those elements guarantees that the underlying purpose of the statute is met and that no prejudice is visited on the opposing party. In each case, the court is required to assess the facts against the clearly defined elements to determine whether technical non-conformity is excusable.

In *Cornblatt, supra*, we were faced with the applicability of the Affidavit of Merit statute to causes of action where the legally significant facts arose prior to the effective date of the statute. 153 *N.J.* 218, 708 *A.*2d 401. We held that the statute does not apply in such circumstances and, more particularly, that it did not apply in the *Cornblatt* case. *Id.* at 236, 708 *A.*2d 401. We then addressed the status of a certification filed in lieu of an affidavit and concluded that the doctrine of substantial compliance could be invoked to excuse technical non-compliance with the Affidavit of Merit statute.

We began our analysis by answering the pivotal question: whether there is a legislative intent to preclude a substantial compliance analysis in the affidavit of merit setting. We answered that question in the negative:

> In light of the doctrine of substantial compliance, which requires reasonable effectuation of the statute's purpose ... and the existing practices in this general area that attempt to reconcile convenience and truth under *Rule* 1:4–4(b), there is no reason to infer that the Legislature intended that the statute be applied literally and strictly, rather than in a manner that would assure substantial compliance with its essential provisions. Thus, we recognize that, under certain circumstances, a certification could satisfy the purpose of the affidavit requirement as well as the general purpose of the statute.

[*Id.* at 240, 708 *A.*2d 401.]

Then, applying the five *Bernstein* criteria (although not by name), we detailed how a plaintiff could sustain a substantial compliance claim in a case involving a timely certification instead of an affidavit:

Those circumstances would also include at the very least the timely filing of a certification otherwise complying with all of the specifications for an affidavit of merit; an adequate and reasonable justification and convincing explanation of just cause and excusable neglect for submitting a certification rather than an affidavit; and, further, that the adverse party was not prejudiced and obtained the requisite notice in that the certification contained the quality and level of information contemplated by the affidavit requirement. Further, a relevant circumstance would involve the plaintiff undertaking prompt measures to comply fully with the statute, including specifically the filing of an affidavit or the agreement of an adversary that the certification provided fully meets the substantive requirements of the statute. We determine that under such circumstances, the statutory requirement for the affidavit of merit would be deemed to have been met by the initial filing of a certification instead of an affidavit of merit.

[*Ibid.*]

■ *Cornblatt* has been widely misunderstood as a rather narrow authorization of substantial compliance in the affidavit of merit setting. As a result, the Appellate Division is split over its meaning in the context of an unsworn expert's report. *See Ricra v. Barbera,* 328 *N.J.Super.* 424, 746 *A.*2d 68 (App.Div.2000); *Mayfield v. Community Med. Assocs., P.A.,* 335 *N.J.Super.* 198, 762 *A.*2d 237 (App.Div.2000). In *Ricra,* the court held that *Cornblatt's* invocation of the doctrine of substantial compliance was narrowly limited to cases in which a plaintiff seeks to satisfy the statute with a certification. 328 *N.J.Super.* at 430, 746 *A.*2d 68. Thus, *Ricra* denied a plaintiff the right to base a substantial compliance claim on an unsworn expert's report. *Id.* at 431–32, 746 *A.*2d 68. *Mayfield, supra,* reached a different conclusion, interpreting *Cornblatt* as addressing that particular complex of facts but allowing the invocation of substantial compliance in any case in which the elements of the doctrine are satisfied without regard to the nature of the underlying report. 335 *N.J.Super.* at 206–09, 762 *A.*2d 237.

*Mayfield* correctly interpreted *Cornblatt.* We did not intend in that case to restrict the power of our courts to apply the doctrine of substantial compliance when appropriate. What *Ricra* conceived as a limit imposed by *Cornblatt* is nothing more than a restatement of the template for a substantial compliance case. In *Cornblatt,* Justice Handler, writing for the Court, did exactly what

precedent required. He declared that the Legislature did not intend to prohibit use of substantial compliance in the affidavit of merit setting and he then tested the facts of *Cornblatt* against the five elements of the doctrine. The Court's analysis was neither restrictive nor expansive. By declaring that there was no legislative intent to the contrary, *Cornblatt* authorized the application of the substantial compliance doctrine in any affidavit of merit case in which its use is justified by the facts.

To be sure, in *Cornblatt* we discussed the way in which the affidavit/certification quandary could be resolved by resort to the elements of substantial compliance, but there is no reason to conclude that the doctrine should be limited to that factual scenario. In the absence of a contrary legislative intent, *Mayfield* properly determined that the doctrine of substantial compliance is applicable so long as the facts of the case satisfy the elements of the doctrine. Indeed, the very notion of substantial compliance requires a fact-sensitive analysis involving the assessment of all of the idiosyncratic details of a case to determine whether "reasonable effectuation of the statute's purpose" has occurred. *Cornblatt, supra,* 153 *N.J.* at 240, 708 *A.*2d 401. This case demonstrates, on its facts, that the elements of substantial compliance have been satisfied.

Here, there is no evidence in the record that any defendant has been prejudiced by plaintiff's filing of an unsworn and uncertified expert's report approximately eight months before filing the complaint. As *Mayfield* concluded:

> First, ... we see no prejudice whatever that would result to defendants, other than that they would have to defend against a potentially meritorious claim, which is not legal prejudice. Certainly, there has been no showing of prejudice to defendants that would outweigh the strong preference for adjudication on the merits rather than final disposition for procedural reasons, or would warrant visiting on the innocent clients an error of their attorney. Moreover, with respect to prejudice, we have not been told, for example, of any loss of evidence or undue additional defense costs that could result from allowing plaintiffs' case to proceed.
>
> [*Id.* at 207, 762 *A.*2d 237 (citations omitted).]

Indeed, one might fairly argue that it was plaintiff who was prejudiced where, as here, defendants relied on Dr. Pizzi's pre-

complaint reports to engage in settlement efforts through their carriers and then, without warning, moved to dismiss for failure to file an affidavit of merit.

The second and third elements of substantial compliance—that the plaintiff took a "series of steps" to comply with the statute and generally met its purpose—are also satisfied. Plaintiff retained an expert before filing suit, forwarded the medical records to the expert, obtained both an initial and a supplementary expert report, and sent both to defendants' carriers who attempted to settle the case on defendants' behalf. That constituted a substantial good faith effort to comply with the statute and to satisfy its underlying purpose. The carriers obviously notified the insureds, on whose behalf they engaged in settlement negotiations, thus satisfying the fourth prong. Finally, plaintiff's attorney explained that he acted as he did because of his belief that he was doing more than what the statute required.

In sum, this is a classic substantial compliance case. Regarding Drs. Acosta, DeLuca and Greifinger, Dr. Pizzi's unsworn reports satisfy the temporal requirements of the Affidavit of Merit statute. Moreover, because they identify Drs. DeLuca and Greifinger by name and describe their malpractice with specificity, they satisfy the salutary purposes of the statute regarding those defendants.

Going forward, in every case attorneys should file a timely and substantively appropriate affidavit of merit, not only to avoid litigation like this, but to avert dismissal of meritorious cases. As we have indicated, substantial compliance depends on a lack of prejudice to the defending party; a series of steps taken to comply with the statute; general adherence to the purposes of the statute; reasonable notice of the claim; and a reasonable explanation of why there was not strict compliance. *Bernstein, supra*, 151 *N.J.Super.* at 76–78, 376 *A.*2d 563 (citing *Zamel, supra*, 56 *N.J.* at 6–7, 264 *A.*2d 201). Establishing those elements is a heavy burden. It was met in this case because plaintiff's counsel obtained a detailed expert's report verifying the legitimacy of the claim long before filing the complaint, immediately shared it with

defendant's carriers, and engaged in settlement discussions with defendants based on the report. Indeed, plaintiff's counsel explained that he believed that he had exceeded his obligation under the Affidavit of Merit statute. At least in part, because his actions were taken in previously uncharted waters, that explanation was reasonable.

## V

Although Dr. Pizzi's unsworn reports are also sufficient to meet the time constraints in the Affidavit of Merit statute regarding Dr. Acosta, there remains the issue of whether those reports are substantively adequate regarding that defendant. The question, and it is a close one, is whether they meet the affidavit of merit mandate that "there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." *N.J.S.A.* 2A:53A–27.

Dr. Pizzi did not name any physician in the November 11, 1996 report and named only Drs. DeLuca, Fusco, Greifinger and Shivashankar in the March 12, 1997 supplement. Nevertheless, it is undisputed that Dr. Acosta was Mrs. Galik's radiologist, at least for the original cervical spine X ray. In that connection, in the initial report, Dr. Pizzi stated that there was a substantial deviation from the standard of medical care; that the initial radiologist (Dr. Acosta) should have taken flexion-extension X rays; that not doing so was an "oversight"; and that that oversight "may be excusable" if the flexion-extension views were not taken because of a possible brachial plexus injury (injury to the group of nerves at the armpit and base of the neck that leads to the nerves in the arms and hands). The fair import of Dr. Pizzi's report is that he believed, on the basis of the records before him, that Dr. Acosta had committed malpractice by omitting flexion-extension X rays but that he was leaving open the possibility that Dr. Acosta, at some later point, could explain the omission.

■ That reading of the initial report is supported by Dr. Pizzi's belated affidavit of merit. Although that affidavit was untimely and thus could not vault plaintiff over the temporal threshold of the statute, it can be resorted to as post-hoc evidence of what Dr. Pizzi's initial report was meant to establish: that by a reasonable probability a meritorious claim exists against Dr. Acosta. Given that there is no legislative interest in barring meritorious claims brought in good faith, the initial report of Dr. Pizzi, although not a model of clarity, passes substantive muster under the Affidavit of Merit statute.

## VI

The judgment under review is reversed. The complaint is reinstated against Drs. Acosta, DeLuca, Gangemi, Greifinger and Shivashankar. The case is remanded for trial.

For reversal and remandment—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA and ZAZZALI—6.

*Opposed*—None.